IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN PETER FLERONVIL and<br>JEAN RENALD DOLCIN,<br><br>　　　　　　Defendants. | Case: 1:22–mj–00243<br>Assigned To Magistrate Judge: Harvey, G. Michael<br>Assign. Date : 11/7/2022<br>Description: Complaint w/ Arrest Warrant |

**AFFIDAVIT IN SUPPORT OF
<u>AN APPLICATION FOR AN ARREST WARRANT</u>**

This affidavit is submitted by Special Agent Jacqueline Valdes in support of a complaint and application for an arrest warrant relating to:

JOHN PETER FLERONVIL (hereinafter FLERONVIL), a Haitian citizen who is believed to reside outside of Port-au-Prince, Haiti.

JEAN RENALD DOLCIN (hereinafter DOLCIN), a Haitian citizen who is believed to reside outside of Gros-Morne, Haiti.

I respectfully submit that there is probable cause to believe that, between on or about July 29, 2022, and on or about August 5, 2022, FLERONVIL and DOLCIN have committed the following criminal offenses in violation of United States law:

18 U.S.C. § 1203(a) (Conspiracy to Commit Hostage Taking and Hostage Taking).

**AGENT BACKGROUND**

1.　　I am a Special Agent with the Federal Bureau of Investigation ("FBI"), having been so employed since March 2018. I am currently assigned to the Extra-Territorial Violent Crimes Squad of the FBI's Miami Division. As a Special Agent with the FBI, I have received general law enforcement training, and I have been personally involved in investigations concerning a variety

of violations of federal offenses, including international violent crime, health care fraud, wire fraud, money laundering, diversion of opioids, bank robbery, and other violations of federal law.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, 19, 21, 22, and 31 of the United States Code.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

## JURISDICTION AND VENUE

4. This Court has jurisdiction and venue to issue the requested warrant. Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As described herein, the criminal offenses under investigation began or were committed out of the jurisdiction of any particular State or district, no offender has been arrested in or first brought to a district in the United States for these criminal offenses, and no offender is known to have, or have had, residence within any district in the United States. 18 U.S.C. § 3238.

## FACTS ESTABLISHING PROBABLE CAUSE

5. The FBI has received reports from multiple U.S. citizens stating that, while in Haiti in July and August 2022, they were kidnapped at gunpoint and held by an armed gang, later identified as Kokorat san Ras. According to open source reporting and information provided to me by the Haitian National Police (HNP), Kokorat san Ras is a Haitian-based gang that operates

in areas known as Tibwadom and Gros-Morne, which are approximately an hour and a half south of Port-de-Paix, Haiti, by car. Kokorat san Ras has been known to commit armed robberies, assassinations, rapes, and kidnappings for ransom. Haitian police have reported armed conflicts with the gang during efforts to suppress the activities of the gang. Multiple gang members have been arrested in the past by Haitian police for firearms-related and other offenses, including defendants FLERONVIL and DOLCIN.

6. Following FLERONVIL's arrest by Haitian police on or about September 11, 2022, and publication of his photograph via online sources, three U.S. citizens reported information about FLERONVIL to the FBI, including as described herein.

*Victims 1 and 2*

7. On or about July 22, 2022, VSK and PK, a married couple and both U.S. citizens, traveled to Haiti to visit family members. After arriving in Port-au-Prince, VSK and PK traveled to an area slightly northwest of Port-de-Paix.

8. According to VSK, on or about July 28, 2022, VSK and PK left the Port-de-Paix area and began driving southbound back towards Port-au-Prince with three other individuals. Along the drive, they encountered a traffic jam and were informed by other drivers that the road was blocked due to nearby gun battles between Haitian police and local gangs. VSK, PK, and the three other individuals decided to sleep in their car to wait out the traffic jam.

9. The following day, on July 29, 2022, the roads appeared clear so VSK, PK, and the other individuals in the car continued on their way. Other vehicles had also waited out the traffic jam overnight and began driving southbound as well. However, after driving along the road for a short period of time to an area known as Gros-Morne, VSK, PK, and their three companions heard gunshots coming from both directions on the road and realized they were trapped between the

gunfire. VSK, PK, their three companions, and individuals from other cars on the road all exited their vehicles and ran into nearby houses for shelter.

10. While VSK and PK were sheltering inside a house, approximately ten to twelve masked men armed with firearms (hereinafter "the hostage takers") approached and demanded that VSK, PK, and the other individuals seeking shelter exit the houses. The men threatened to burn down the houses and kill everyone one by one if they did not comply. VSK, PK, and the other individuals exited the house with their hands in the air.

11. The hostage takers forced everyone back into their vehicles at gunpoint, and ordered them to drive down back roads until they reached a particular location. One of the hostage takers entered VSK and PK's car and remained with them during the ride.

12. Once they all arrived at the hostage takers' specified location, VSK, PK, and the other hostages were ordered out of their vehicles and told to sit in a large grassy area. One of the gang leaders, later identified as defendant FLERONVIL, told the hostages that they were being held by the "Kokorat san Ras" gang.

13. VSK explained that members of the gang proceeded to rummage through the victims' vehicles, stealing the victims' personal property, such as money, cellphones, and tablets. While the gang members initially all wore masks, they gradually removed their masks due to the heat.

14. The gang members then ordered some of the hostages to drive and some of the hostages to walk to a house approximately ten minutes away that was guarded by another armed gang member. Once at the house, a gang leader later identified as defendant DOLCIN, informed the hostages that the gang had found two U.S. passports in the belongings of the hostages and demanded that the two U.S. citizens identify themselves. VSK and PK identified themselves as

U.S. citizens, at which point VSK, PK, and their three travel companions were separated from the rest of the group.

15. The gang members informed VSK and PK that they would not be released without a ransom payment, and were told to call any friends or family members who would act as negotiators on their behalf. The gang at first demanded $400,000 for their release, but the amount was eventually dropped to $10,000 after VSK and PK explained they would not be able to come up with that much money. VSK and PK complied with the gang's demands to call family and friends to negotiate a ransom with the gang.

16. VSK, PK, and their three travel companions were held in the safe house overnight and were not free to leave. The following day, July 30, 2022, one of their travel companions was released and told to raise ransom money for the remaining hostages from friends and family living in Haiti. Also on July 30, 2022, another group of hostages was brought to the safe house. VSK identified SJC, a victim described below (Victim 3), by first name.

17. VSK and PK were held until August 3, 2022. During that time period, VSK and PK, as well as other hostages, were moved to two other locations. According to VSK, the gang members told the hostages they were being moved because the Haitian police were following the gang and engaging in shootouts with the gang. During the period of captivity, ransom negotiations continued between family members of PK and the gang members.

18. VSK and PK's family and friends were eventually able to raise enough money for their release, and the gang agreed to release them on or about August 3, 2022. VSK and PK were driven by motorcycle to a location about an hour and fifteen minutes away from where they were being held captive, and were released to a family member. According to VSK, a total of $10,500 in U.S. currency was paid to the gang in exchange for VSK and PK's release.

19. On or about November 3, 2022, VSK met with the FBI. VSK provided the above information, and also made the following identifications:

   a. FLERONVIL. Following her release, VSK initially contacted the FBI and informed agents that she recognized FLERONVIL as one of the hostage takers from his arrest photograph disseminated by Haitian police via online sources after his arrest on or about September 22, 2022. VSK subsequently met with the FBI and was shown nine photographs of individuals known by the FBI to be Haitian gang members and identified a photograph of FLERONVIL as one of the members of the gang involved in the hostage taking. VSK explained that she overheard FLERONVIL called "Major" and "Ti Blan" by other hostage takers. FLERONVIL appeared to VSK to be one of the gang leaders, in part because FLERONVIL was in charge of the negotiations with their family and friends, and in charge of the hostages' cellular phones. Other hostage takers also addressed him as though he held a position of authority. According to VSK, FLERONVIL was armed with a firearm and present when the victims were all first taken hostage, and was the individual who announced that they were being held by the Kokorat san Ras gang. VSK explained that FLERONVIL initially wore a mask, but then took it off and told the hostages that if they reported him that he would have them killed by people he knew in the United States. VSK stated that she saw FLERONVIL every day of their captivity. At one point, FLERONVIL threatened to shoot PK because he indicated he was unable to raise enough money. FLERONVIL indicated that he was trying to leave Haiti and travel to the Dominican Republic.

   b. DOLCIN. When VSK was shown nine photographs of individuals known by the

6

FBI to be Haitian gang members, she also identified a photograph of DOLCIN as one of the members of the gang involved in the hostage taking. VSK explained that DOLCIN was described by other hostage takers as the brother of "the President" of the gang, and VSK overheard DOLCIN being called "Major" by other hostage takers. According to VSK, DOLCIN was armed with a firearm and present when the victims were all first taken hostage. DOLCIN was the individual who demanded to know who the U.S. citizens were in the group. VSK explained that she was able to see DOLCIN without a mask on his face, and specifically described an instance on the third day of the captivity during which DOLCIN brought a bottle of rum to the hostages, but explained that they could not be released yet because the money had not been paid. On this occasion, DOLCIN wore a hat with no mask on his face.

  c. Other gang members. VSK also recognized three other individuals in the photographs, whose true identity is not known to the FBI.

*Victim 3*

20. On or about July 30, 2022, SJC, a U.S. citizen, traveled to Port-au-Prince, Haiti.

21. SJC reported the following facts to the FBI. On July 30, 2022, SJC arrived at Port-au-Prince-Toussaint Louverture International Airport in Port-au-Prince, Haiti. SJC was bound for Port-de-Paix, Haiti, to visit his wife. SJC was driven by a taxi driver (hereinafter "Individual 1") with two other individuals to Port-de-Paix.

22. During the drive, SJC overheard Individual 1 speak by phone to an individual that Individual 1 referred to as "Chief."

23. When they reached an area known as Gonaives, which is a city slightly more than halfway between Port-au-Prince and Port-de-Paix, Individual 1 stopped the car and told SJC and

7

the two other passengers that another driver, Individual 2, would be transporting them the rest of the way to Port-de-Paix.

24. Individual 2 arrived in a yellow pick-up truck with four other passengers already in the vehicle. SJC and the two other individuals that were traveling in Individual 1's vehicle boarded Individual 2's pick-up truck and headed towards an area known as Tibwadom, which is north of Gonaives and en route to Port-de-Paix.

25. When Individual 2's pick-up truck reached the area known as Tibwadom, SJC witnessed several males carrying long guns who demanded that the truck stop. Another vehicle approached the truck from the opposite direction with additional males carrying long guns. The armed men demanded that SJC and the two other individuals he had traveled with from the airport in Port-au-Prince exit the pick-up truck and get into their vehicle. Inside the vehicle were two individuals, later referred to by other hostage takers as "President" and "General." The "General" informed SJC and his other two travel companions that they were sold to him by Individual 1 and Individual 2.

26. SJC and the two other individuals were driven for about five minutes without anything covering their eyes, at which point they were told to exit the vehicle and empty their pockets. The hostage takers threatened to shoot them if they later found money still in their pockets. A man on a motorcycle came to retrieve their belongings and left. At the direction of the hostage takers, SJC and the two other individuals got back into the vehicle with the hostage takers and drove to an area with a big yard. SJC saw what appeared to be approximately 30 other hostages when he arrived at the big yard, some of whom later informed him that they had also been kidnapped. SJC and the other victims were taken to a house on the property with a tin roof.

27. That evening, a guard asked SJC to identify someone to negotiate on his behalf.

SCJ identified his sister-in-law to negotiate on his behalf.  The guard provided SJC with a phone and SJC called his sister-in-law to inform her that he had been kidnapped and asked her to negotiate for his release.

28.     SJC and other hostages were moved to different locations while in captivity.  The hostage takers informed SJC and the other hostages that the police were raiding the area.  Your affiant notes that, according to a press release issued by the HNP on August 3, 2022, the HNP conducted an operation in Gros-Morne, which is an area approximately halfway between Gonaives and Port-de-Paix.  According to the press release, during the operation, three alleged members of the Haitian gang known as Kokorat san Ras were killed.

29.     SJC explained that during his captivity, some of the guards told him that they were part of the Kokorat san Ras gang.  SJC also observed members of the guards taking cellular phone videos during which they spoke about their gang affiliation with Kokorat san Ras.

30.     During his captivity, SJC also interacted with a hostage taker identified to him by other hostage takers as the "General's brother."  The other hostage takers informed SJC that the General's brother had just been released from prison in Port-au-Prince.  According to SJC, through his captivity, the General's brother acted as a hostage negotiator and had conversations with SJC about the status of the negotiations.

31.     According to SJC, SJC was released on or about August 5, 2022, following a ransom payment of 350,000 Haitian dollars (approximately $2,683.00 U.S. dollars).  SJC's family and friends told SJC that they raised money for the ransom.  Three family members of SJC's sister-in-law, who reside in the Dominican Republic, paid the ransom.  SJC was present when the ransom payment was made, and left on a motorcycle driven by one of SJC's family members after the ransom payment was delivered.

32. Following his release, SJC met with the FBI on several occasions. SJC provided the above information, and also made the following identifications:

   a. FLERONVIL. SJC provided the FBI the arrest photograph circulated online by Haitian law enforcement, which was identified as JOHN PETER FLERONVIL by the Haitian authorities. SJC identified FLERONVIL as one of his hostage takers. SJC explained that FLERONVIL was present with other hostage takers when he was dropped off near the area with the big yard, and was armed with a .45 caliber pistol. SJC stated that he saw FLERONVIL's face as neither he nor any of the other hostage takers wore masks. SJC explained that he saw FLERONVIL daily during his captivity, and had face-to-face conversations with FLERONVIL. SJC also explained that FLERONVIL was one of the individuals who facilitated SJC speaking with his family on the phone, and that FLERONVIL acted as one of the negotiators during SJC's captivity.

   b. DOLCIN. SJC was also shown six photographs of individuals known by the FBI to be Haitian gang members, including DOLCIN. SJC did not identity DOLCIN during the identification procedure.

**The Defendants**

33. On September 11, 2022, Haitian law enforcement officials arrested eight alleged members of the Kokorat san Ras gang who were attempting to flee across the Haitian border into the Dominican Republic. Haitian law enforcement officials published the arrestees' names and photographs online. One picture was of FLERONVIL, and the photo included his name.

34. Your affiant was able to review two social media profiles associated with the name "John Peter Fleronvil," both of which are publicly accessible. Both social media profiles contained

photographs of an individual posted in 2016 and 2017, who appears to your affiant be the same individual in the arrest photographs circulated by Haitian officials and provided to the FBI by SJC. In one of the social media profiles, the user claims to currently live in Ville Des Gonaives, Artibonite, Haiti, and to originally be from Port-de-Paix, Haiti.

35. HNP provided the FBI with a photograph and true name of DOLCIN. According to Haitian law enforcement, DOLCIN is a known leader of the Kokorat san Ras and was previously arrested in Haiti, which is why his identification was known to HNP.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

36. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for an Arrest Warrant. I submit that Assistant U.S. Attorney John F. Korba, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

37. Based on the forgoing, I submit that there is probable cause that FLERONVIL, DOLCIN, and their coconspirators have violated 18 U.S.C. § 1203(a) (Conspiracy to Commit Hostage Taking and Hostage Taking).

Respectfully submitted,

*[signature]*

Special Agent Jacqueline Valdes
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on November 7, 2022

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE